Bell, J.
On December 9, 1909, A. W. Sindlinger, defendant in error and plaintiff below, hereinafter called-plaintiff, borrowed of J. P. Moody, one of the plaintiffs in error and a defendant below, the sum of $12 for one month, on his promissory note, secured by a chattel mortgage on one 41/2-foot flat-top oak desk, one 4-foot low roll-top oak desk, three swivel chairs, five common chairs, one worn brussels carpet, containing about 22 yards, and all office furniture, equipment, etc., then had and used at Room 15, 1624 Curtis Street, Denver, Colo. Moody himself prepared the mortgage for execution, and filed the same for record. The note was made for the payment of $15, and whether the additional $3 represent the expenses of preparing and filing the papers for record, advanced interest, a bonus or something else, is not disclosed by the record. The note was not introduced in evidence; but we infer from the evidence that plaintiff was required to pay $1 per month for the use of the money, and paid the costs of two extensions hereinafter mentioned. The property covered by the mortgage was removed by plaintiff, with the consent of Moody, from Room 15, 1624 Curtis Street, to offices on Champa Street. On January 7th, 1911, between 5 and 6 o’clock P. M., Moody and his co-defendant, Grutzmacher, an expressman, the other plaintiff in error herein, entered the unlocked office of plaintiff on Champa Street, and in his absence removed therefrom certain property, including a certain roll-top desk, in which were locked one Oliver typewriter, and business and private papers of the plaintiff, all of which prop *292 erty, with the exception of said papers, which Moody claims to have returned, Moody sold, after due advertisement, in the foreclosure of his mortgage. For this taking, carrying away and conversion of said property, plaintiff instituted this action, alleging in his complaint malice on the part of the defendants, and praying judgment in the sum of $1,500 for the damages alleged to have been suffered, and that a body execution be issued thereon. The defendants, in their answer, denied the material allegations of the complaint; and for a further defense, alleged that the property in question was taken under and by virtue of the provisions of a chattel mortgage from plaintiff to Moody, which had matured upon default in the payment of a promissory note, for which it was given to secure. The case was tried in the County Court of the City and County of Denver, and resulted in a judgment in favor of the plaintiff in the sum of $247.50 and costs, from which an appeal was taken to the District Court of said City and County, and the case tried there to a jury of six, who returned a verdict as follows :
“We, the jury, find the issues herein joined for the plaintiff, and assess his damages at the sum of seven hundred and fifty no-100 dollars and......cents, and that said defendant J. P. Moody was guilty of fraud, malice and wilful deceit.
($750.00) “George J. Lord,
“Foreman.”
Upon this verdict judgment for the amount thereof was entered against both defendants, and it was ordered that plaintiff have execution against the body of defendant Moody, and that he, Moody, be committed to the jail of the City and County of Denver for a term not exceeding three months, to be released, however, upon the payment of the judgment so rendered against him.
At the trial plaintiff’s principal contentions were that the mortgage, by reason of a certain extension thereof, did *293 not mature until January 9th, 1911, two days after the property was taken in foreclosure, and that the desk and its contents, taken by defendants, were not covered by the mortgage.
As to the first of these contentions, plaintiff testified that on or about August 16th, 1910, he paid to a Mr. Stempe, an agent of Moody, the sum of $2 for an extension of the mortgage, and received a receipt therefor. Continuing, he said:
“After he gave me this receipt I paid him the $2. He got up to go out; says I, ‘Mr. Stempe, you have not given me the date of the extension — have not written on this receipt; I have given you $2 for an extension.’ ‘Well,’ says he, T suppose that is the old extension of six months, but you must see Moody,’ and that is my receipt; then I noted, myself, on the edge here, right in his presence, ‘January 9, 1911.’ I wrote that myself, in his presence, because he said, T suppose the extension would be like the former.’ I went up and saw Moody a number of times in reference to the matter, and he never said it was not like the former extension.”
On cross-examination he admitted that he never saw Moody about the matter, and that he never examined the records to learn to what date the mortgage had béen extended.
Defendants introduced in evidence a certified copy of the record of an extension, which was acknowledged and filed for record August 6th, 1910, and extended the mortgage to and including November 9th, 1910. Moody testified that this was the last extension made, and it was the only written evidence of an extension received or offered at the trial. This instrument, therefore, should control as to the date of the maturity of the mortgage as extended, as there was no evidence of fraud, accident or mistake to justify its overthrow or contradiction by the mere oral testimony of the plaintiff.
*294 The mortgage, then, having matured or become due November 9th, 1910, as evidenced by this extension, defendant Moody was at liberty to foreclose in a proper manner, and in accordance with the terms of the statute any time after this date; and it now remains to be determined whether or not the record shows that be exceeded his rights in pursuing his remedy.
The record is crowded with evidence to the effect that soon after the note as extended matured, Moody informed plaintiff that he could not further extend it, or carry it longer; that the amount was so small that it cost him more to look after it than it was worth; that he and his employees had made repeated written and verbal demands for the settlement of the amount due, and though none of the principal had been paid, and some of the interest had lapsed, he offered to accept $10 and release everything; that on Saturday, the 7th day of January, 1911, two months, lacking two days, after the maturity of the note, he, in the absence of the plaintiff, left notices at his office that it would have to be settled on that day. Late in the afternoon he, becoming fearful that the plaintiff had not received the notices, sent an employee to plaintiff’s home, and informed him that the goods would be taken that day unless he should come to the office or arrange for the settlement of the claim. Plaintiff informed the agent that the note would not be due until the following Monday, and that he would settle it when due. He admitted to the agent that he then had the amount with which to make settlement, but made no further offer or tender in the matter. About 5:30 o’clock P. M., after Moody had exhausted every reasonable endeavor to obtain a settlement, and after the mortgaged property ha.d been subject to the claims of plaintiff’s creditors and subsequent purchasers for some 28 days in preference to the claim of the mortgagee, Moody with'Grutzmacher, his co-defendant, and another assistant, entered the unlocked office of the plaintiff, which was also occupied by a Mr. Lovell, and took *295 orderly possession of the mortgaged property, except some broken chairs and a roll-top desk, which seems to have been left by mistake. ' A larger roll-top desk, which contained some papers and an Oliver typewriter, which had been purchased subsequent to the execution of the mortgage, and mixed with the mortgaged property without the' knowledge of Moody, was taken by mistake in lieu of the desk left at the office. Almost immediately after the removal of the property, Moody returned some loose papers, and sent the plaintiff a nóte, which he received, demanding the key of the desk taken by mistake, and informing him that he would be glad to return any of the property not covered by the mortgage. Plaintiff failed to respond to the overtures of Moody, and after a number of days the desk was forced open, the papers carefully sacked and returned to him.
The values alleged in the complaint of all the property taken, excluding the papers, etc., aggregated $199.50. Plaintiff testified that the desk that was not covered by the mortgage was worth $65, and that the typewriter was worth $75. On cross-examination he admitted that he bought the desk on partial payments for $20, and the typewriter for $22.50, which-he paid in payments of two and three dollars each.
It is evident from his testimony that he valued these two pieces of property at more than three times what he paid for them.
The mortgage described two desks, which were the only ones in plaintiff’s office when the mortgage was executed, and after specifically mentioning the other articles herein-before enumerated, it contained a general provision including all office furniture or equipment then had or used in the office. Moody testified that he called upon the plaintiff at his office, and demanded a settlement, some 15 or 20 days after the note as extended had matured, and plaintiff insisted on a further extension, saying that he, Moody, did ■not need the money, and pointed out the very roll-top desk *296 which was taken, and in which the typewriter and papers-were locked, and informed Moody that it was covered by his mortgage, and that the mortgaged property wa^ worth two or three times the amount of his claim.
It is not at all strange or an evidence of carelessness that Moody should make a mistake in the selection of these desks, under thé circumstances attending this long and tedious transaction; and there is nothing disclosed in the record that even tends to establish fraud, malice or wilful deceit in the taking of the property. In fact, the mortgagee used great patience, and made repeated endeavors to effect some kind of a settlement, and continued his negotiations for some 28 days after losing a preferred right to the property.
Defendant Grutzmacher was merely an expressman, who knew nothing at all about the transaction, and was engaged by Moody to remove the property. It is shown that he acted in the matter in the ordinary way and in the usual course of his employment, and moved the furniture to a storage house, as directed by his employer.
Under this character of evidence, a judgment against the defendants or either of them for $750 is grossly excessive, and has no support in the record.
Plaintiff’s testimony to the effect that he had suffered great loss by reason of having his papers, forms and facilities for work taken from him was too uncertain and speculative upon which to base a claim for more than nominal damage. While it is insisted that defendants took a desk not covered by the mortgage, yet they left a desk that was so covered; some of the papers were returned immediately, and others were offered immediately; the key to the desk was requested, so that its contents could be ascertained; and. it is admitted that Moody offered to return anything therein not covered by the mortgage. Under these conditions the plaintiff had the opportunity, and it was his duty, to minimize the damages by accepting the offer of Moody.
*297 The jury were instructed that they might award reasonable exemplary damages. There is no substantial evidence in the record to justify such an instruction, and therefore the question was erroneously submitted to the jury. Whether there is any evidence to justify the finding of exemplary damages is a question for the court. If there.is none, it is error to submit the. question to the jury: Eisenhart v. Ordean, 3 Colo. App., 162, 170, 32 Pac., 495, citing 1st Sedg. on Damages, 3rd Ed., Sec. 387; Rose v. Story, 1 Pa. St., 190, 44 Am. Dec., 121; Amer v. Longstreth, 10 Pa. St., 145; Pittsburg R. S. Co. v. Taylor, 104 Pa. St., 306, 49 Am. Rep., 580; Selden v. Cushman, 20 Cal., 506.
To entitle a person to exemplary damages for a wrongful act, under sec. 2185, 1st Mills Ann. Stats., 1912, there must be an element of fraud or malice or evil intent or-oppression entering into and forming part of the act: Eisenhart v. Ordean, supra.
In Denver Tramway Co. v. Cloud, 6 Colo. App., 445, 450, 40 Pac., 779, it appeared that Cloud was riding upon a car of the company on paid transportation, and the company’s agents concluded that his transfer ticket was irregular, and forcibly ejected him from the car, using such force only as was necessary for this purpose. The trial court instructed the jury that they might award exemplary or punitive damages to the plaintiff, and Bissell, J., speaking for the Court of Appeals, said the evidence must disclose some wrong motive in the doing of the thing complained of, or else the circumstances of the act must show a reckless disregard of the injured person’s right; that malice could not be implied; that the officers of the company made a mis-: 1 ake, and that the company should respond in compensatory damages; that the courts were not at liberty to infer bad motives, but that the proof must show the existence of such motives; or if the action was based on a disregard of the passenger’s rights exhibited by the employee, it was equally *298 necessary to prove facts establishing this disregard, and its reckless character.
Geraghty v. Randall, 18 Colo. App., 194, 200, 70 Pac., 767, was an action by the purchaser of mining stock against the seller thereof to recover back the purchase price, on the grounds that the sale was effected through the false and fraudulent representations of the defendant. The jury returned a general verdict for the plaintiff, and in answer to a special interrogatory, found that the defendant was guilty of fraud and wilful deceit. The trial court sustained the general verdict, but set aside the special finding, on the ground that it was not sustained by the evidence. On appeal it was urged that the rulings of the trial court were contradictory in sustaining the general verdict, on the ground of fraud, and setting aside the answer to the special interrogatory, finding defendant guilty of fraud and wilful deceit. Judge Thompson, in speaking for the Court of Appeals, said it was contended that the trial court, in" setting aside the special finding, found there was no evidence of fraud, and that, with the question of fraud eliminated, there was nothing in the casé to support a judgment against the defendant. Continuing, he said:
“It is manifest that there was no inconsistency between the general verdict and the special finding. By their general verdict, as well as by their answer to the interrogatory, the jury found that the transaction was fraudulent; and there being no question of inconsistency between the two, we do not think that the action of the court in setting aside the special finding was inhibited by the code provision. In our opinion, sec. 2164 of Mills’ Statutes contemplates an aggravated case — one in which the wrong is premeditated and intentional. A person may obtain the money or property of another by means of statements which are untrue, but of the truth or falsity of which he is without knowledge. In such case he might be held responsible as for a legal fraud, although there was no active intention to commit a wrong. Converse v. Blumrich, 14 Mich., 108.
*299 “But while such representations have been held to be false and fraudulent in law, they lack the peculiar feature of guilt implied in the words ‘malice, fraud or wilful deceit,’ as used in sec. 2164. We think that from the connection of the word ‘fraud’ with the words ‘malice’ and ‘wilful deceit’ it was intended to be understood in its odious sense. By denying the motion to set aside the general verdict the court held that there was evidence of fraud, and we cannot suppose that it intended to contradict itself; so that in setting aside the special verdict on the ground that it was not supported by the evidence, the court must have regarded the finding as having reference to actual and intentional fraud. The court was evidently of the opinion that the evidence did not warrant the extreme conclusion reached by the jury in their special finding, regarding it, however, as amply sufficient to sustain the general verdict. Counsel are therefore mistaken as to the import of the court’s ruling. This was not that there was no evidence of fraud, but that there was not sufficient evidence upon which a verdict, whose effect would be to deprive the defendant of his liberty, could be properly rendered.”
In Republican Pub. Co. v. Conroy, 5 Colo. App., 262, 266, 38 Pac., 423, the court said the punitive damage statute, Session Laws 1889, page 64, did not operate to change the rule of damages in any case where nothing, is shown except the naked wrong.
See also French v. Deane, 19 Colo., 504, 511, 36 Pac., 609; and Page v. Yool, 28 Colo., 467, 65 Pac., 636:
Of course, in view of these holdings, it cannot be said that the record presents any evidence of fraud, malice or wilful deceit on the part of Moody that can. justify an execution against his body, as ordered by the trial court; and as the verdict of the jury is excessive'and against the weight of the evidence, as hereinbefore pointed out, the judgment based thereon is reversd, and the case remanded.

Reversed and remanded.